

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JPL:MSA
F.#2007R00569

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 26, 2011

**By ECF**

The Honorable Edward R. Korman
United States District Judge
Eastern District of New York
275 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Dayshen Richardson
           Criminal Docket No. 07-635 (ERK)

Dear Judge Korman:

      On July 15, 2008, the defendant pled guilty before Magistrate Judge Marilyn D. Go to Counts 2, 3, 5, 6, 10, 12, 14, 20, 24 and 31 of a thirty-three count indictment. The indictment charged the defendant and five others with conspiring to distribute and possess with intent to distribute at least 50 grams of cocaine base between February 2006 and February 2007, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846, and substantive counts of distributing cocaine base, in violation of 21 U.S.C. § 841(b)(1)(C). Sentencing is scheduled for October 27, 2011.

      The defendant argues for a substantial departure from the advisory sentencing range under the United States Sentencing Guidelines ("USSG" or "Guidelines"). For the reasons that follow, the defendant's arguments should be rejected and a sentence within the advisory Guidelines range is appropriate.

I.   Overview

      Between at least February 2006 and February 2007, in the Vanderveer housing development ("the development") in Brooklyn, New York, the defendant and his co-conspirators, Charles Moore, Aaron and Demiya Rountree, Joseph Lawton, and Taniqua Thomas operated a crack-cocaine enterprise under the defendant's direction. See Presentence Investigation Report ("PSR") ¶¶ 3-7. The organization operated 24 hours per day, seven days per week from an apartment taken over from a crack-addicted woman named Antoinette Lawton ("the apartment" or

"Lawton's apartment"), which the co-conspirators jointly secured by giving Lawton crack cocaine for her personal use.¹ See id. The co-conspirators also assisted one another in making drug sales, either by covering each other's sales or directing customers to co-conspirators in the event a conspirator did not have crack to sell. See id. The investigation revealed that scores of individuals purchased crack cocaine from the co-conspirators daily, conservatively representing 28 grams of cocaine base per day. See PSR ¶ 6. Furthermore, the co-conspirators defended their turf through violence on several occasions, including Richardson's murder of a rival gang member during a dispute over drug territory. See PSR ¶ 8.

II. Trial of Charles Moore

A. Narcotics Evidence

Many of the details of the defendant's narcotics conspiracy were presented at the March 2009 trial of the defendant's co-conspirator, Charles Moore. At the conclusion of the trial, Moore was convicted of conspiring with the defendant, Aaron and Demiya Rountree, Taniqua Thomas and Joseph Lawton to distribute and possess with intent to distribute at least 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841 and 846.

At Moore's trial, the government presented the testimony of New York City Police Department ("NPYD") Detective DuCarmel Pierre, an undercover detective who bought over 180 grams of crack cocaine from the defendant and his co-conspirators, largely at Lawton's apartment. The government also called Antoinette Lawton, who testified pursuant to a non-prosecution agreement.²

Antoinette Lawton testified that, in 2006 and 2007, the defendant and his co-conspirators sold drugs together from her apartment under the defendant's direction. Transcript of March 2009 Trial of Charles Moore ("Tr.") 141, 146, 156, 159.³ The

---

¹ Unless otherwise noted, "Lawton" refers to Antoinette Lawton and not her son Joseph.

² Lawton was arrested an pled guilty in New York State court to felony drug charges as a result of her participation in the conspiracy. She was sentenced to probation with a condition that she participate in drug treatment. At the time of her testimony, Lawton had been drug-free since her arrest.

³ Unless otherwise indicated, citations to "Tr." refer to the March 2009 trial of Charles Moore.

defendant was the first person to sell drugs from Lawton's apartment. Tr. 142. Eventually, the defendant moved into Lawton's apartment, and agreed pay Lawton with crack cocaine in exchange for permission to use the apartment for drug sales. Tr. 143 ("Do you know what brought [the defendant] into your apartment? "He wanted to sell drugs. I was a crack head. We made a deal.").

The drug sales from Lawton's apartment went on all day, every day. Tr. 146. Sales were busiest from the first to the third of each month, when public assistance checks are delivered. Tr. 147. Lawton estimated that drug dealers in her apartment obtained $500 worth of crack every two to three days. Tr. 147, 166-168. The defendant used part of his drug proceeds to support Lawton's household. Tr. 148. At times, the defendant also sold drugs from Demiya Rountree's apartment. Tr. 156.

Detective Pierre's drug purchases corroborated Lawton's testimony. On several occasions during the investigation, Detective Pierre arranged narcotics transactions with the defendant, but a co-conspirator completed the transaction on the defendant's behalf. For example, on February 28, 2006 and March 23, 2006, Detective Pierre arranged crack cocaine transactions with the defendant that, at the defendant's instructions, Taniqua Thomas completed. Tr. 30-31, 34-35. Furthermore, on March 15, 2006, Detective Pierre went to the apartment to purchase crack cocaine, and a woman identified as "J.D. Nicole" and Aaron Rountree made the sale because the defendant and Thomas were not present. Tr. 34.

On March 8, 2006, Detective Pierre bought $100 of crack cocaine from Moore and the defendant. Tr. 31-32, 77. By telephone, the defendant instructed Detective Pierre to meet him at an apartment inside of 1352 Newkirk Avenue, also part of the Vanderveer Houses. Tr. 32. In the apartment, the defendant instructed Moore to give Detective Pierre ten $10 bags of crack cocaine. Id. Moore said that he did not have all ten bags, instead providing Detective Pierre with nine and using the defendant's drugs to supply three additional bags in exchange for $100. Tr. 31-32, 77-78.

On April 1, 2006, Detective Pierre called the defendant's telephone to set up a drug transaction, but the defendant's girlfriend Taniqua Thomas answered and instructed Detective Pierre to go to the apartment. Tr. 35. Inside Lawton's apartment, Detective Pierre found Moore and Thomas. Tr. 35, 89. Detective Pierre told Thomas that he had $40 to spend on crack. Id. Thomas instructed Moore to make the sale. Tr. 35, 103. Moore took a clear ziplock bag containing approximately six

smaller ziplock bags from his pants pocket and gave Detective Pierre four bags of crack cocaine in exchange for $40. Tr. 35, 37.

While Detective Pierre was leaving Lawton's apartment, he encountered the defendant, who was just arriving. Id. The defendant asked Detective Pierre whether everything was okay. Id. Detective Pierre replied that Moore had just sold him drugs. Id. The defendant said, "good." Id. Detective Pierre and the defendant planned an additional crack transaction for later in the day. Tr. 38.

On April 4, 2006, by telephone, Detective Pierre arranged a drug transaction with the defendant. Tr. 38. Later in the day, at Lawton's apartment, Detective Pierre pre-paid $60 to the defendant for 3.5 grams of crack, and purchased an additional four ziplock bags of crack for $40. Tr. 38. About an hour later, at the apartment, the defendant returned the $60 to Detective Pierre because the defendant was unable to obtain the drugs Detective Pierre had ordered. Tr. 39.

Detective Pierre asked the defendant to sell him an additional two ziplock bags of crack. Tr. 39, 92. The defendant instructed Moore, who was present, to make the sale. Tr. 39, 92, 104. Detective Pierre paid Moore $20 in exchange for two small ziplock bags of crack cocaine, which Moore took from a larger ziplock bag pulled from his pants pocket, containing approximately ten small ziplock bags of crack. Tr. 39, 92.

On February 20, 2007, Detective Pierre went to Apartment 3C to purchase drugs. Tr. 45. He encountered Moore and Joseph Lawton on the landing in front of the apartment door and asked for the defendant. Tr. 45, 103. Moore and Lawton informed Detective Pierre that the defendant was at Demiya Rountree's apartment, the defendant's second drug apartment at the time. Tr. 45. Moore said that Joseph Lawton had drugs to sell, however. Tr. 46. Detective Pierre asked to buy $120 worth of crack, and requested that Lawton give him additional bags of crack for free as a courtesy. Id. Lawton refused, stating that he had to receive permission from the defendant to give away drugs. Id. Moore told Lawton that it was okay to give Detective Pierre extra drugs without charge. Id. Lawton was reluctant, however, so Detective Pierre went to Demiya Rountree's apartment and bought $120 worth of crack cocaine from the defendant. Id.

On May 10, 2007, NYPD officers executed a search warrant on the apartment, seized drug packaging materials and arrested Joseph Lawton in possession of approximately twelve small ziplock bags of crack cocaine.

B. <u>Violence Connected to the Conspiracy</u>

Between 2005 and 2007, the defendant, a member of the Bloods street gang, had several confrontations with members of the rival Crips street gang, which dominated the Vanderveer Houses. Tr. 151. On one occasion, the defendant had an argument with Crips members who were selling drugs in the hallway outside of Lawton's apartment, which the defendant considered to be his territory. <u>Id.</u>

On another occasion, an individual known as "Showboat" entered Lawton's apartment, intending to sell drugs there. Tr. 152. The defendant objected and the man left, but returned shortly afterwards with several other individuals. Tr. 152. The defendant pulled out a gun and pointed it at "Showboat" and the others, who fled from the apartment. Tr. 152, 169-70.

In around the summer of 2006, the defendant and Moore had a fight in Lawton's apartment with a Vanderveer drug dealer known as "Moe." Tr. 152-53, 165-66. The defendant had objected to Moe's drug dealing. Tr. 153. The defendant and Moore beat Moe, and the defendant kicked Moe when he fell to the floor. Tr. 153, 163. Moe escaped from the apartment, but the defendant shot a gun out of the window at Moe as Moe fled the building. Tr. 154, 163.

On April 23, 2007, a group of Crips members came to Lawton's apartment to confront the defendant, a Bloods gang member, about selling crack cocaine inside a Crips-controlled housing development. <u>See</u> PSR ¶ 11. After a confrontation with one of the rival gang members in the hallway, the defendant retrieved a handgun from Lawton's apartment and went outside the building to where the gang members had congregated after the confrontation. <u>See</u> <u>id.</u> A security camera captured the defendant sneaking from behind the rival gang members and shooting at one of them. <u>See</u> <u>id.</u> The gang member was struck by bullets from the defendant's gun and died shortly thereafter. <u>See</u> <u>id.</u> The defendant fled into Lawton's apartment, changed his clothes, gave the murder weapon to Taniqua Thomas and took a taxi cab from the Vandeveer Houses. Later that evening, Thomas brought the gun to the defendant, who was in the East New York section of Brooklyn.

Co-conspirator Charles Moore confirmed the defendant's commission of the murder. At the time of Moore's May 29, 2007 arrested, Moore stated that the defendant was a Bloods gang member. Also according to Moore, the defendant said that Crips members were trying to "extort" the defendant for selling crack in their neighborhood. Moore further stated that the defendant

had shot a member of the Crips street gang, and that it was "stupid" for him to have done so. The defendant told Moore, "It was coming down to that anyway."

III. <u>Defendant's Arrest and Indictment on State Murder Charges</u>

On May 7, 2007, the defendant was arrested on state murder charges for the April 23, 2007 homicide. On August 7, 2007, he was transferred into federal custody pursuant to a writ of habeas corpus <u>ad</u> <u>prosequendum</u>. <u>See</u> PSR ¶ 15.

IV. <u>The Defendant's Motion to Sever and Guilty Plea</u>

On July 10, 2008, the defendant moved to sever all counts of the indictment charging him with substantive crack cocaine sales from the counts charging him with conspiring to distribute cocaine base and acting in concert with others to distribute cocaine base. <u>See</u> January 10, 2008 Letter to the Court from Counsel (Case Docket Sheet Entry #80). In his motion, the defendant suggested that, "The remaining charges could be held in abeyance until after the conclusion of a <u>Fatico</u> hearing in which the government would have an opportunity to address issues of weight, role, etc." <u>Id.</u>

At a status conference in the case held the next day, the defendant reiterated his motion to sever the substantive counts of the indictment from the conspiracy count, offered to plead guilty to the substantive counts, and moved to hold the remaining count in abeyance pending sentencing. <u>See</u> Transcript of July 11, 2008 at 4-5 ("[H]old the remaining counts in abeyance and following my client's plea and his sentencing, the other counts would be out there and if the government thought it was necessary, I am sure that we could have a trial on the balance of the counts."). The Court granted the severance. <u>Id.</u> at 7 ("Well go ahead. If you want to schedule the plea, go ahead. Then we'll sever the -- we won't go to trial and we'll sever the counts.").

On July 15, 2008, the defendant pled guilty to Counts 2, 3, 5, 6, 10, 12, 14, 20, 24, 31 and 31 of the indictment. <u>See</u> PSR ¶ 1. Of the counts pertaining to the defendant, counts 1, 4, 8, 11, 15, 16, 22, 25, 26, 27, 29, 32 and 33 remain open. <u>See</u> <u>id.</u>

V.   Argument

    A.   The Defendant's Factual Arguments

In his October 14, 2011 sentencing submission, the defendant misstates a number of facts related to the case and makes other editorial comments with which the government takes issue. To the extent the defendant's misstatements bear on sentencing, the government's response is set forth below.

First, the defendant understates the criminal conduct associated with his presence in Antoinette Lawton's apartment by suggesting that he merely "lived" there "with several friends." See Defendant's October 14, 2011 Sentencing Submission ("Def.") 2. In fact, the defendant's use of Lawton's apartment was central to the conspiracy. As reflected at the trial of co-defendant Charles Moore, the defendant literally took over the apartment of Lawton, a crack addict, by providing her with free crack cocaine. See PSR ¶ 4. Furthermore, the defendant sold crack from, and possessed firearms in, Lawton's apartment despite the fact that Lawton's young daughters lived there. Tr. 150 (After a period of the defendant's selling crack cocaine from Lawton's apartment in her childrens' presence, Lawton placed them in their father's care.). To suggest that the defendant simply "lived" in Lawton's apartment is a gross understatement of the defendant's conduct.

Second, the defendant places blame on investigators for the defendant's conduct, suggesting that they were "complicit" in his crime due to the length of the investigation. This also is incorrect, and belies the defendant's professed acceptance of responsibility for his actions.

To begin, law enforcement need not justify the length of its investigation, which was controlled by the requirements of a broader investigation into criminal conduct throughout the Vanderveer Houses, the need to obtain evidence sufficient to obtain criminal convictions against all of the defendants, and the safety of the undercover detective who conducted the entire development-wide investigation. Moreover, instead of demonstrating law enforcement's complicity in criminal conduct, the length of the investigation illustrates the extent of the defendant's crimes. Indeed, it could just as easily be argued that law enforcement provided the defendant with every opportunity to cease his conduct prior to arresting him, but the defendant chose to continue trafficking crack cocaine for the entire span of the charged conspiracy.

Lastly, the defendant repeatedly alleges that his co-conspirators were crack-addicted youths at the time they committed the offense, and criticizes investigators for contributing to their collective crack use. See, e.g., Def. 2, 6. This is incorrect. As the Court is aware from the sentencing proceedings of those individuals, at the time of the offense, all of the co-conspirators other than Joseph Lawton were well into adulthood: Aaron Rountree was 33 years old; Demiya Rountree was 30 years old; Charles Moore was 32 years old; and Taniqua Thomas was 22 years old.

In addition, the co-conspirators were not crack addicts. Only Taniqua Thomas reported to using crack cocaine to the Probation Department, and her use consisted of three occasions during the 13 months the conspiracy existed. Aaron Rountree, Demiya Rountree and Moore all denied any crack cocaine use. Thus, the defendant's attempt to characterize the co-conspirators as drug-addled teens whose crack use was supported by law enforcement funds is inaccurate.

B. The Defendant Is Not Entitled to a Reduction for Acceptance of Responsibility

The defendant argues that, because he pled guilty to eleven of the twenty-one counts of the indictment pertaining to him, he is entitled to a three-point reduction in his Guidelines Total Offense Level for acceptance of responsibility. See USSG § 3E.1. The Probation Department similarly awards the defendant a reduction for acceptance of responsibility. See Amended PSR ¶ 39. The defendant is not entitled to such a reduction.

Indeed, the defendant's guilty plea was more an evasion rather than acceptance of responsibility. The Court should not permit him to bootstrap an attempt to avoid trial on more serious charges into a sentencing reduction based on acceptance. The defendant was the founder and leader of the conspiracy charged in the indictment, and demonstrated that leadership throughout the investigation by directing his co-conspirators' drug dealing and engaging in acts of violence to protect his drug territory. The defendant's guilty plea failed to account for much of that conduct. He therefore is not entitled to a three-point reduction for acceptance of responsibility under the Guidelines.

C.  The Defendant's Commission of a Homicide is Properly Included in the PSR

The defendant argues that all references in the PSR to the defendant's murder of a Crips gang member in furtherance of the conspiracy charged in the indictment should be deleted because he was indicted on state charges for that conduct. See Def. 4. The defendant cites no authority for his argument, and it should be rejected. The defendant's commission of a murder that was a result of his drug and gang activities in the Vanderveer Houses is relevant to the Court's determination of a proper sentence. It is therefore appropriate to include a discussion of the event in the PSR.

D.  A Leadership Role Enhancement is Appropriate

The defendant objects to a four-level enhancement to his Total Offense Level for his leadership role in the offense. See Def. 5, Amended PSR ¶ 29. A leadership role enhancement is clearly appropriate.

The defendant's leadership role was established both by his behavior during individual transactions and by information provided by co-conspirators during the investigation. As described during Moore's trial, the co-conspirators sold crack cocaine under The defendant's supervision. See Tr. 145-47 ("How was it determined who would take turns [selling crack cocaine]?" "[The defendant] had the say of everything. It didn't go down if it didn't go through him . . . [The defendant's] drugs had to go first all the time or you couldn't do nothing in the house.").

Furthermore, the defendant directed a number of transactions with the undercover detective that his co-conspirators executed. See, e.g., Tr. 32-33, 79-88, 92-93, 184 (the defendant instructed Moore to sell crack to Det. Pierre); 35-37, 146-56 (Thomas, the defendant's girlfriend and lieutenant, instructed the defendant to sell to Det. Pierre); 39, 92, 104 (the defendant instructed Moore to make sale to Det. Pierre). The defendant also used Joseph Lawton to sell crack cocaine for him, paying Joseph with clothes and sneakers. See Tr. 149. In fact, during one transaction with the undercover detective, Joseph Lawton specifically stated that he required the defendant's permission to provide additional drugs as a courtesy. See Tr. 45-46, 103.

These facts establish the defendant's leadership role in the conspiracy, and a four-point role enhancement is appropriate. See USSG § 3B1.1.

E. <u>The Defendant is a Career Offender</u>

The defendant contests the Probation Department's conclusion that he is a Career Offender under the Guidelines because he was respectively 16 and 17 years old at the time of his two prior felony convictions. <u>See</u> Def. 5, PSR ¶¶ 44-48, 54. The defendant's claim should be rejected.

As stated in the PSR, the defendant was over 18 years old at the time of the instant offense, and had two prior felony convictions for either a controlled substance offense or a crime of violence. <u>See</u> PSR ¶ 54, USSG § 4B1.1. He is therefore a Career Offender under the Guidelines.

Without arguing that his convictions fail to qualify as "prior convictions" under the Guidelines, the defendant claims generally that his youth at the time of those convictions precludes his classification as a Career Offender. <u>See</u> Def. 5. The defendant's argument is misplaced. Convictions sustained prior to the age of 18 are properly considered in a defendant's Criminal History computation if the defendant was treated as an adult under state law, determined by such factors as whether the defendant was prosecuted in adult court, the length of the sentence, and whether the defendant served his sentence in adult prison. <u>See</u> USSG § 4A1.2(d); <u>United States v. Driskell</u>, 277 F.3d 150 (2d Cir. 2002). For his two prior felony convictions, the defendant was treated as an adult under New York state law. <u>See</u> PSR ¶¶ 44-45. Indeed, having previously been adjudicated a Youthful Offender, <u>see</u> PSR ¶ 42, the defendant was required to be treated as an adult for his two subsequent convictions. <u>See</u> N.Y. Crim. Proc. Law § 720.10(2)(c) (any person under 19 is eligible for youthful offender classification with exceptions, including if "such youth has previously been adjudicated a youthful offender following conviction of a felony"). The defendant, therefore, is a Career Offender under the Guidelines.

F. <u>A Two-Point Enhancement for Use of Violence is Proper</u>

Under the current Guidelines, a two-point enhancement for use of violence in connection with the offense is appropriate. <u>See</u> USSG § 2D1.1(b)(2). The defendant is subject to this enhancement for violent acts he committed to defend his drug turf. <u>See</u> Tr. 152-54, 163-66. During the conspiracy, the defendant and Charles Moore beat another drug dealer for alerting Crips gang members to the defendant's drug activity, and then shot at him while he attempted to escape. <u>See id.</u> Thus, a two-point enhancement for use of violence is therefore warranted pursuant to USSG § 2D1.1(b)(2).

G.  The Remaining Counts of the Indictment Should Not Be Dismissed

In a one-sentence footnote without citation to legal authority, the defendant argues that the open counts of the indictment should be dismissed "for failure to prosecute." Def. 2 n. 2. The defendant is incorrect.

As set forth above, the defendant moved to sever the open counts from the indictment and hold those counts in abeyance pending sentencing. See Tr. July 11, 2008 at 4-5. Moreover, on February 2, 2010, the defendant moved to adjourn his sentencing "to facilitate counsel's efforts to coordinate Mr. Richardson's pending state charges with his federal matter." See February 2, 2010 Letter to the Court from Counsel (Docket Sheet Entry #185). The defendant has never requested a trial on the open counts. Because it is the defendant who orchestrated the current posture of this matter, and the defendant who requested that his sentencing be adjourned, a dismissal of the open counts for failure to prosecute would be inappropriate.

H.  Sentencing Factors Under 18 U.S.C. § 3553(a)

1.  Guidelines Calculation

a.  Amount of Narcotics Involved in the Offense

The defendant contends that he should be held accountable at sentencing only for the crack cocaine involved in the substantive counts to which he pled guilty. See Def. 5, Amended PSR ¶ 26. The defendant, however, is responsible under the Guidelines for the full amount of cocaine base trafficked by his organization during the scope of the conspiracy, conservatively estimated to be 500 grams. See USSG § 1B1.3. The corresponding Base Offense Level under the Guidelines is 32. See USSG 2D1.1(4).

Guidelines section 1B1.3 holds a defendant responsible for "all reasonably foreseeable acts . . . of others in furtherance of . . . jointly undertaken criminal activity." USSG § 1B1.3. To apply section 1B1.3, the court must determine (1) the scope of the criminal activity the defendant agreed to commit, and (2) what co-conspirator acts in furtherance of such jointly undertaken criminal activity were "reasonably foreseeable" to the defendant. Id. In this case, the investigation established the defendant's responsibility for all retail narcotics sales involved in the conspiracy.

First, the evidence demonstrated the existence and scope of the conspiracy among the drug dealers operating from Lawton's apartment. As noted above, the co-conspirators agreed to sell crack cocaine under the defendant's supervision, predominately from Antoinette Lawton's apartment, secured by keeping Lawton supplied with crack cocaine for her personal use. The co-conspirators further agreed as to who among them would make individual sales, contributed to the expense of providing Lawton with crack cocaine and defended their territory with violence.

The investigation further demonstrated the defendant's membership in the conspiracy and that his conduct was part of "jointly undertaken" criminal activity. The defendant secured Lawton's apartment for the co-conspirators' narcotics trafficking, supplied narcotics for many of his co-conspirators to sell, directed the drug dealing from the apartment and defended the co-conspirators' territory from rival gang members. See, e.g., Tr. 32-33, 79-88, 92-93, 152-53, 163-66, 184 (the defendant instructed Moore, identified as "J.D. Camouflage," to sell crack to Detective Pierre); 39, 92, 104 (the defendant instructed Moore to make sale to Detective Pierre); see also PSR ¶ 7. These facts establish the defendant's responsibility for the criminal conduct of his co-conspirators. See United States v. Studley, 47 F.3d 569, 576 (2d Cir. 1995)

With respect to the total amount of narcotics involved in the conspiracy, the investigation revealed that the co-conspirators sold a total of 130 grams of crack cocaine to the undercover detective. See PSR ¶¶ 7, 13. Moreover, the investigation established that the co-conspirators operated 24 hour per day, seven days per week, selling crack cocaine to 300 customers daily. See PSR ¶¶ 4-7, Probation's conclusion that the defendant was responsible for between 500 grams and 1.5 kilograms of cocaine base during the thirteen months that the conspiracy existed is therefore highly conservative. The defendant's objection should therefore be rejected.

  b. Total Offense Level and Advisory Guidelines Sentence

As set forth more fully above, the government concurs with the Probation Department that the defendant is a Career Offender under the Guidelines. See Amended PSR ¶ 38. The applicable Offense Level is therefore 40. See USSG 4B1.1(b)(B). Because no deduction for acceptance of responsibility is warranted, the Total Offense Level is 40. As a Career Offender, the defendant's Criminal History Category is VI. See USSG

§ 4B1.1(b)(B), PSR ¶ 54. The resulting advisory Guidelines sentence is 360 months to life.

Alternatively, the Probation Department correctly assessed a four-point and two-point enhancements respectively for the defendant's leadership role and use of a firearm in connection with the offense. See Amended PSR ¶¶ 27, 29. As set forth above, a two-point enhancement for committing acts of violence in connection with the offense is also appropriate. See USSG § 2D1.1(b)(2). Under this analysis as well, the resulting Total Offense Level is 40. Even without applying the Career Offender Guidelines, the defendant falls within Criminal History Category VI. See PSR ¶ 53. The advisory Guidelines sentence is 360 months to life.

Lastly, the Probation Department correctly applied Guidelines § 2D1.1(d)(1) to cross-reference the Base Offense Level for First Degree Murder, see USSG § 2A1.1(a), which is 43. See PSR ¶ 26. With the enhancements set forth above, the Total Offense Level is 51. With a Criminal History Category of VI, see PSR ¶¶ 25, 53, the resulting advisory sentence under this analysis is also 360 months to life.

### 2. Additional Factors Under 18 U.S.C. § 3553(a)

First, the statute directs the Court to consider the nature and circumstances of the offense. See 18 U.S.C. § 3553(a)(1). Here, the defendant conspired to distribute a drug that has caused serious health and social problems for its users. Moreover, the conspiracy occurred at a location long plagued by narcotics activity, victimizing residents who hope to raise families and live free from the problems associated with drug sales and use. Furthermore, the defendant knowingly took advantage of drug-addicted individuals in furtherance of his narcotics trafficking, rendering his crime even more egregious. In addition, as outlined in the PSR, the defendant experienced first-hand as a child the devastation that drug addiction causes to families and communities, yet continued to engage in the same conduct well into adulthood. The offense was therefore extremely serious.

Second, the Court should consider the history and characteristics of the defendant. See 18 U.S.C. § 3553(a)(1). With respect to this factor, in arguing for a lenient sentence, the defendant places much emphasis on the trauma he experienced as a child. While the government does not minimize the effect of the defendant's difficult upbringing, it respectfully submits that he presents himself too much as a victim and beholden to a drug addiction rather than a significant drug trafficker who made

decisions during adulthood - he was 26 at the time of the offense - that led to his current situation.

Third, the defendant's sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. See 18 U.S.C. §§ 3553(a¶¶)(2)(A), (B), (C). The seriousness of the offense, especially in the context of the community in which it occurred, is discussed above. The government submits that promoting respect for the law and deterrence are important considerations in this case due to the defendant's extensive history of interaction with the criminal justice system.

In this case, the need to protect the public from further crimes of the defendant is significant. The defendant has two drug-related convictions and a conviction for robbery. See PSR ¶¶ 42-48. During the robbery, the defendant threatened the victim with a knife and assaulted her sexually. See PSR ¶ 47. The defendant spent over five years in custody for that offense before being paroled. See PSR ¶ 46. His parole was revoked after three months because of drug use. See id. The defendant sustained another felony conviction while in prison for possessing a box cutter. See PSR ¶¶ 49-50.

In all, the defendant received two separate sentences of one-to-three years incarceration, another sentence of two-to-four years incarceration and yet another sentence of 18 months to three years incarceration. See PSR ¶¶ 42, 44, 46, 49. None of these sentences deterred the defendant from engaging in the instant offense and from committing a more serious crime, i.e., murder. Thus, the need to protect the public from additional crimes by the defendant calls for a lengthy term of imprisonment in this case.

Fourth, in light of the defendant's limited education, the defendant could benefit from educational and vocational training. See 18 U.S.C. §§ 3553(a)(2)(D) & (a)(3).

## Conclusion

For the reasons stated herein, the government respectfully submits that a sentence within the advisory Guidelines range is appropriate in this case.

                          Respectfully submitted,

                          LORETTA E. LYNCH
                          United States Attorney

By:      /s/
     Matthew S. Amatruda
     Assistant U.S. Attorney
     (718) 254-7012

cc: Susan Kellman, Esq.